UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| ELLEN OXFELD, ROBIN LLOYD, MARTHA ABBOTT, JERRY GREENFIELD, and ELIZABETH GREENFIELD, | : : : : |
| Plaintiffs, | : : |
| v. | : Case No. 2:08-cv-174 : |
| WILLIAM SORRELL, Vermont Attorney General; and DEBORAH MARKOWITZ, Vermont Secretary of State; in their Official Capacities; | : : : : : |
| Defendants. | : |

**OPINION and ORDER**

Plaintiffs seek a preliminary and permanent injunction to prevent Defendants from enforcing provisions of Vermont law that limit the amount Plaintiffs may contribute to the campaign of Anthony Pollina, a candidate in the Vermont 2008 gubernatorial election. A hearing on the merits of Plaintiffs' claim took place on October 1, 2008. Based on the undisputed evidence presented by the parties and the arguments of counsel, the Court **grants** Plaintiffs' request for a preliminary and permanent injunction on the narrow grounds described below.

**I. Background**

   **A. The Parties and Claims**

Plaintiffs Ellen Oxfeld, Robin Lloyd, Martha Abbott, Jerry Greenfield and Elizabeth Greenfield ("Contributors") are five Vermont residents who contributed more than $1000.00 to Pollina's

campaign.[1]  Defendants are William Sorrell, Vermont Attorney General, and Deborah Markowitz, Vermont Secretary of State, in their official capacities ("State").  The State is charged with enforcing the laws at issue in this case, and is threatening to begin enforcement proceedings against the Pollina campaign to require it to return to Contributors any donations above $1000.00.

Contributors' Amended Complaint alleges that under 42 U.S.C. § 1983, the State has violated Contributors' First Amendment right to free political association by restricting Contributors' donations to Pollina.  Assuming that Vermont's 1981 campaign finance law applies, Contributors claim that they may each donate up to $2000.00 to Pollina.  Alternatively, Contributors argue that: (1) Vermont's 1997 campaign finance law's "two-year general election cycle" language is still in effect; or (2) since portions of the 1997 campaign finance law were found unconstitutional, the 1981 law cannot be revived because this law is also unconstitutional.  Contributors' Motion for Preliminary and Permanent Injunction seeks to prohibit the State from enforcing or threatening to enforce a $1000.00 contribution limit

---

[1] Oxfeld contributed a total of $1250.00 between December 3, 2007 and June 25, 2008.  Lloyd contributed $2000.00 on February 1, 2008, and Abbott made two $1000.00 contributions on July 27, 2008.  Jerry Greenfield contributed $2000.00 on June 30, 2008, and Elizabeth Greenfield made two $1000.00 contributions, one on July 3, 2008 and the other on August 11, 2008.

on their donations to Pollina. By addressing Contributors' initial claim involving questions of statutory interpretation of Vermont's 1981 campaign finance law, it will be unnecessary to address the parties' broader constitutional concerns in order to resolve this matter. *See Glavin v. Clinton*, 19 F.Supp.2d 543, 551 (E.D.Va. 1998) (finding that "case can be resolved on statutory basis alone without reaching the Constitutional question."); *see also Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 347 (1936) (describing rule that "if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter.") (J. Brandeis, concurring).

**B. Vermont's Law on Individual Campaign Contributions**

For nearly a century, the Vermont Legislature has attempted to regulate campaign finances by limiting campaign contributions and expenditures, and requiring candidates to disclose financial information. *See Landell v. Sorrell*, 118 F.Supp.2d 459, 464-468 (D.Vt. 2000), *aff'd in part, vacated in part,* 382 F.3d 91 (2d Cir. 2004), *rev'd sub nom. Randall v. Sorrell*, 548 U.S. 230 (2006) (describing history of campaign finance reform in Vermont). As early as 1971, Vermont law limited campaign contributions to $1000.00 from an individual donor. *Id.* at 464 n.5. This limit remained in the 1981 version of Vermont's campaign finance law, which provided that "[n]o candidate shall

3

accept contributions totaling more than $1000.00 from a single source[2] for any election." Vt. Stat. Ann. tit. 17, § 2805(a). Under the 1981 law, a "candidate" is a person who takes affirmative action to become a candidate for state office in a primary, special, general or local election; and "affirmative action" is defined as one or more of the following: (1) accepting contributions or making expenditures totaling $500.00 or more; (2) filing a nomination petition under this title or being nominated by primary or caucus; or (3) announcing that a person seeks an elected position as a state, county, or local officer or as representative or senator in the general assembly. § 2801(1).[3] Each primary, general, special, run-off or local election is considered a separate election. § 2801(7). The 1981 revision to the campaign finance law also moved the law within the Vermont Election Laws statute from chapter 36, §§ 2051-2057 to chapter 59, §§ 2801-2883.

Even after the 1981 revisions to Vermont's campaign finance law, in the 1990s there continued to be growing public concern over the negative impact of money on Vermont's electoral politics. In response, the Vermont Legislature drafted and

---

[2] A single source is "an individual, partnership, corporation, association, labor organization or any other organization or group of persons which is not a political committee or political party." Vt. Stat. Ann. tit. 17, § 2801(6).

[3] Unless otherwise noted, all statutory citations are to Vermont Statutes Annotated, Title 17.

passed a thorough and comprehensive bill to further limit large campaign contributions and expenditures.  *See Landell*, 118 F.Supp.2d at 465-468.  The 1997 Vermont Campaign Finance Reform Act ("Act 64") expanded Vermont's ability to regulate campaign finances by reaching a broader range of campaign activities and candidates.  Act 64 also took a new approach to setting campaign contribution limits, basing such limits on a two-year general election cycle.  For example, a candidate for governor could receive up to $400.00 from any single source in a two-year general election cycle; a candidate for state representative could receive up to $200.00, and a candidate for state senator could receive up to $300.00.  *See* §§ 2805(a), (b)(2002 & Supp. 2007).  A "two-year general election cycle" is defined as "the 24-month period that begins the day after a general election." § 2801(9).  With strong bipartisan support from members of the Vermont Senate and House of Representatives, then-Governor Howard Dean signed Act 64 into law on June 26, 1997.  *Landell*, 118 F.Supp.2d at 467.

Beginning in May 1999, several groups filed suit challenging the constitutionality of Act 64.  In March 2000, these cases were consolidated in *Landell*.  The issue of the constitutionality of Act 64's contribution limits (among other provisions) was eventually appealed to the United States Supreme Court.  The Supreme Court decided that Act 64's limits on campaign

contributions were unconstitutional because they were too restrictive, and stated that it did not appear possible "to sever some of the Act's contribution limit provisions from others that might remain fully operative. . . . [because it] would require [the Court] to write words into the statute . . . or to leave gaping loopholes . . . or to foresee which of many different possible ways the legislature might respond to the constitutional objections we have found." *Randall*, 548 U.S. at 261-62. On remand, this Court ruled that Act 64's limits on contributions to candidates were unconstitutional (among other rulings on the constitutionality of Act 64's provisions that were challenged in *Landell*). *See* Ct.'s Final J. Order 2, Sept. 26, 2007.

After *Randall*, the Vermont Legislature drafted and passed two campaign finance bills: Senate Bills 164 & 278 ("S.164" & "S.278"). *See, e.g.,* S.B. 278 § 1(11), 2007-08 Gen. Assem., Adj. Sess. (Vt. 2008) (noting the extensive record supporting the need for campaign finance regulation in light of *Landell* and *Randall*). In 2007, the Vermont Senate and House of Representatives passed S.164, but the Vermont Governor vetoed S.164 on May 30, 2007. The Senate voted to override the Governor's veto on July 11, 2007, but the House of Representatives took no further action on S.164, so it did not become law. *See* Vt. Const. ch. II, § 11 (requiring the concurrence of both Houses for a bill to become a law after a Governor's veto). The same series of events was

6

repeated in 2008: the Senate and House of Representatives passed S.278; the Governor vetoed S.278 on April 4, 2008; the Senate voted to override the veto; and the House of Representatives took no further action. To date, no campaign finance law has been enacted post-*Randall*.

Given that Act 64's limits on individual campaign contributions were found unconstitutional and that Vermont has not enacted a law to replace the unconstitutional portions of Act 64, the parties assume that the law prior to Act 64 applies, based on the doctrine of revival. While Vermont has not explicitly adopted this legal doctrine, the weight of authority favors its application here.[4] Moreover, if the prior statute is not revived, campaign contribution limits would not exist. Thus, for purposes of this litigation the applicable law is the 1981 statute that limits individual contributions to $1000.00 for any election. *See, e.g.*, Office of the Secretary of State, *Guide to*

---

[4] *See Conlon v. Adamski*, 77 F.2d 397, 399 (D.C. Cir. 1935)(stating that "[t]he elementary rule of statutory construction is without exception that a void act cannot operate to repeal a valid existing statute, and the law remains in full force and operation"); *U.S. v. Tufti*, 542 F.2d 1046, 1047 (9th Cir. 1976) (affirming conviction based on statute in force prior to amendments that were later found unconstitutional); *see also Fedziuk v. Comm'r of Pub. Safety,* 696 N.W.2d 340, 349 (Minn. 2005) (stating that "if a law is unconstitutional, only the latest amendment is severed and any previous version found constitutional remains in full force and effect."); *State v. Kolocotronis*, 436 P.2d 774, 782 (Wash. 1968) (same); *Cromwell v. Jackson*, 52 A.2d 79, 89 (Md. 1947) (same); *Van Driel Drug Store, Inc. v. Mahin*, 265 N.E.2d 659, 661 (Ill.1970) (same).

*Vermont's Campaign Finance Law* ("*Campaign Finance Guide*") 23, June 2008.

   **C.   Factual Background**

   In March 2008, Pollina announced he would contest the 2008 Vermont gubernatorial election as a Progressive, making him a major party candidate.  To promote his campaign, Pollina participated in numerous events across Vermont, including radio and TV programs, volunteer gatherings, house parties, and community fora.  Pollina also received contributions from individual donors, including contributions of more than $1000.00.  Contributors each gave $2000.00 to Pollina, except for Oxfeld, who gave $1250.00.  Pollina never filed a petition to place his name on the ballot for the Progressive Party primary, and around July 21, 2008, Pollina announced that he would contest the general election as an independent.[5]

   On August 20, 2008, the Attorney General informed Pollina that his campaign would be in violation of Vermont's Campaign Finance Law, § 2805(a), if it retained contributions over $1000.00 from individual donors.  Since Pollina did not file a petition for the primary election, the Attorney General reasoned that Pollina would be limited to receiving $1000.00 from each individual donor for the general election.  The Attorney General

---

[5] Pollina won the Progressive Party nomination as a write-in candidate in the September 9, 2008 primary election.

stated that it would begin enforcement proceedings if the Pollina campaign did not come into compliance with the law.  *See* Attach. 3, Mot. for Inj., Letter from Michael McShane to Pollina (Aug. 20, 2008).  On August 22, 2008, the Secretary of State wrote to Pollina, explaining that the Pollina campaign appeared to be in violation of the law related to contribution limits for independent candidates.  *See* Attach. 2, Mot. for Inj., Letter from Kathleen DeWolfe to Pollina (Aug. 22, 2008).

On September 3, 2008, Contributors filed their Amended Complaint[6] and a Motion for Preliminary and Permanent Injunction and for Declaratory Relief against the State.  After both parties had an opportunity to brief the issues, a hearing was held on October 1, 2008.

**II. DISCUSSION**

Federal law confers jurisdiction on this Court to hear claims brought under 42 U.S.C. § 1983, as well as claims involving "the deprivation . . . of any right, privilege or immunity secured by the Constitution of the United States."  28 U.S.C. § 1343(a)(3); *see also* 28 U.S.C. § 1331 ("district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").  Contributors filed suit under 42 U.S.C. § 1983

---

[6] The original Complaint was filed on August 27, 2008.  The Amended Complaint adds Plaintiffs Jerry and Elizabeth Greenfield.

alleging a violation of their constitutional right to free political association, so this Court has jurisdiction over the case. Contributors face having a portion of their donations to the Pollina campaign returned to them, so they also have standing to bring this case. *See Landell*, 118 F.Supp.2d at 475 (finding that campaign contributor has standing to challenge campaign contribution law).

"To obtain a preliminary injunction a party must demonstrate: (1) that it will be irreparably harmed if an injunction is not granted; and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of the hardships tipping decidedly in its favor." *Bronx Household of Faith v. Bd. of Ed. of City of New York,* 331 F.3d 342, 348-49 (2d Cir. 2003). If the requested injunction will "stay government action taken in the public interest pursuant to a statutory or regulatory scheme . . . the party seeking injunctive relief must satisfy the more rigorous prong of 'likelihood of success.'" *Id*. at 349. "Where the movant seeks a mandatory injunction (one that will alter the status quo) rather than a prohibitory injunction (one that maintains the status quo), the likelihood-of-success standard is elevated: the movant must show a clear or substantial likelihood of success." *Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77, 97 (2d Cir.

2005). Contributors here request an injunction to prohibit the State from taking action that would require the Pollina campaign to refund to Contributors their donations over $1000.00. The requested injunction seeks to maintain the status quo, and as a result, Contributors need only show a likelihood of success, rather than a clear or substantial likelihood of success. *See id.* (applying likelihood of success standard in case where the injunction would maintain "the status quo before the federal suit was filed.").

In addition, Contributors have sought to consolidate their requests for a preliminary and permanent injunction. "Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing." Fed. R. Civ. P. 65(a)(2). Consolidation lies within the court's discretion, but "[t]he court must give the parties notice of such consolidation sufficient to give them an adequate opportunity to present their case." *Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 101 (2d Cir. 1985). Once there is a trial on the merits, "only a permanent injunction may be granted." 13 James Wm. Moore et al., Moore's Federal Practice ¶ 65.05[4] (3d ed. 2008); *see also Golden Gate Hotel Ass'n v. City & County of San Francisco*, 836 F.Supp. 707, 709 (N.D.Cal. 1993), *vacated on other grounds*, 18 F.3d 1482 (9th Cir. 1994) (finding that court can only issue a permanent

injunction after hearing merits of a claim). The standard for granting a permanent injunction is the same as that for a preliminary injunction, except that the moving party must demonstrate actual, rather than likely, success on the merits of its claim. *See Amoco Prod. Co. v. Vill. of Gambell, Alaska,* 480 U.S. 531, 546 n.12 (1987). Contributors' Motion and the Notice of Hearing made clear that Contributors were seeking a preliminary and permanent injunction. Since the parties had sufficient notice and a hearing on the merits was held, Contributors' request is one for a permanent injunction and they must show actual success on the merits of their claim.

### A. Irreparable Harm

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Bronx Household,* 331 F.3d at 349 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). A direct restraint on rights of free speech or association meets the irreparable harm requirement. *Green Party of New York State v. New York State Bd. of Elections,* 389 F.3d 411, 418 (2d Cir. 2004).

Contributors' ability to make monetary contributions to the Pollina campaign is unquestionably an exercise of their First Amendment right to free political association. *Randall*, 548 U.S. at 246. "Through contributions the contributor associates himself with the candidate's cause, helps the candidate

12

communicate a political message with which the contributor agrees, and helps the candidate win by attracting the votes of similarly minded voters." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 400 (2000) (Breyer, J., concurring). The State's threatened enforcement action will directly restrain Contributors' exercise of their First Amendment right to contribute to the Pollina campaign. The Vermont gubernatorial race is entering a critical juncture, with the general election less than one month away, and if Contributors are restricted from contributing to Pollina, the injury to their First Amendment rights will be "neither remote nor speculative, but actual and imminent and [not] remedied by an award of monetary damages." *Hoblock,* 422 F.3d at 97 (quotation omitted) (finding irreparable harm where election results were to be certified without plaintiff voters' absentee ballots). Contributors have met the irreparable harm requirement for a preliminary and permanent injunction. *See Green Party of New York State,* 389 F.3d at 418 ("where a First Amendment right has been violated, the irreparable harm requirement for the issuance of a preliminary injunction has been satisfied.").

**B. Likelihood of Success on the Merits**

The parties' dispute lies in differing interpretations of the Vermont law applicable to certain key facts: (1) Contributors each donated more than $1000.00 to Pollina; (2) Pollina began his

13

gubernatorial campaign as a major party candidate and then became an independent; and (3) the State intends to begin enforcement proceedings requiring the Pollina campaign to return contributions in excess of $1000.00 made by Contributors.

In evaluating Vermont's law on campaign contributions, this Court must apply the same rules of statutory construction that the Vermont Supreme Court would apply. *See Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir.1994) (federal district court must apply the same analysis as state Supreme Court). Under Vermont law, courts "look first to the plain meaning of the statutory language, and if it is clear and unambiguous, [they] will apply it, without resorting to statutory construction or determination of legislative intent." *Marine Midland Bank v. Bicknell*, 848 A.2d 1134, 1136 (Vt. 2004) (citing *Wentworth v. Fletcher Allen Health Care,* 765 A.2d 456, 461 (Vt. 2000) (mem.)).

The Vermont campaign finance statute is clear and unambiguous. A candidate is any person "who has taken affirmative action to become a candidate for state, county, local or legislative office in a primary, special, general or local election." § 2801(1). An affirmative action is any one or more of the following: accepting contributions or expending at least $500.00; filing a nominating petition; or announcing that a person is seeking an elected state position. §§ 2801(1)(A), (B),

(C).  Pollina announced his candidacy for the Progressive Party primary election and accepted over $500.00 in contributions to his campaign.  These actions made Pollina a candidate for Governor of a major party.

The State argues that Pollina is not a candidate under this law because he did not file a petition to appear on the primary ballot of any major party.  Opp. at 3.  According to the State, the definition of "candidate" in the campaign finance law must be read in conjunction with provisions that outline the requirements for placing a candidate's name on the primary ballot.  *See* §§ 2351-2363.  Sections 2351-2413 set forth the rules governing nominations and are part of a series of provisions that address voting and the conduct of elections.  *See, e.g.*, §§ 2121-2154 (qualification and registration of voters); §§ 2351-2413 (nominations); and §§ 2451-2617 (conduct of elections).  The definition of "candidate" applicable to these provisions is contained in § 2103(7), and this definition is nearly identical to the definition contained in § 2801.  A candidate is:

> an individual who has taken any affirmative action to become a candidate for public office.  A person takes affirmative action by:
> (A) accepting a contribution or making an expenditure directly or indirectly;
> (B) filing the requisite petition for one of the named positions or being nominated by primary or otherwise; or
> (C) publicly announcing that he seeks such a position.

§ 2103(7).  In fact, this definition is broader than the

definition under the campaign finance law; for example, it applies to a candidate who has received contributions or made expenditures in any amount, not just over $500.00. *See* § 2801(1). In light of these almost identical definitions of "candidate," the State's suggestion that the definition of "candidate" in the campaign finance law be limited by other provisions makes no sense.

Moreover, Vermont's campaign finance law is a distinct, stand-alone statute. Unlike other sections of the Vermont Election Laws, the campaign finance law contains its own separate, comprehensive set of definitions. *Compare* §§ 2101-2732 *with* §§ 2801-2832. Further, the law sets forth regulations for campaign finance activities without referring to any other provisions within the Vermont Election Laws statute. The State points to nothing in the campaign finance law that requires construing the definition of candidate together with any other law or regulation; there is no such requirement. The State is interpreting the law in a very limited way that is not supported by a plain reading of the statute or the State's general practice.

The Vermont Legislature intended the campaign finance law to be broadly applied and that appears to be the State's general practice. While the campaign finance law requires contributions to be tied to an election, the State usually takes a broader

16

approach. *See* § 2805(a) (limiting individual contributions to $1000.00 "for any election"). The State permits a candidate to "accept $2,000 *at any time* . . . so long as it is with the intent of applying $1,000 for use in paying for expenses related to the Primary and $1,000 for the General Election. . . . *The timing of the contribution is not necessarily required to track the election itself*." *Campaign Finance Guide* 14 (emphasis added). Under this interpretation of the law, a candidate can receive a $2000.00 contribution from an individual donor the week before the general election, when there is no possibility that those funds will be used for a primary election. The State contends that $1000.00 of such a contribution will go towards expenses or debt incurred for the primary election, but as a practical matter, this has no meaning. Candidates are not required to account for how contributions received after the primary election are spent, so the State cannot monitor whether a $2000.00 contribution was used for the general election, or whether $1000.00 of that contribution was applied to primary election expenses.[7]

Counsel for the State explained that allowing $2000.00 contributions at any time allows for a more easily administered

---

[7] The Vermont Legislature appears to have addressed this issue in its most recent campaign finance bill, which requires a candidate to separately account for primary election and general election contributions. *See* S.B. 278 §§ 4(M)(1),(2),(3), 2007-08 Gen. Assem., Adj. Sess. (Vt. 2008).

17

scheme and that more detailed accounting from candidates would make the reporting requirements too complex. This may be true, but if that is the case, then this policy should be applied consistently across the board.[8] In some cases, the State allows a candidate to receive $2000.00 at any time, without regard to how this contribution is applied to the primary and general elections. Here, however, the State is taking a more restrictive view of the statute by threatening to enforce the $1000.00 contribution limit per election against the Pollina campaign, with no persuasive reason. Contributors have demonstrated the success of their claim.

Pollina was a major party candidate for the primary election because he took affirmative action to become a candidate: he accepted contributions over $500.00 and announced that he sought an elected position for state office. Up until July 21, 2008, when Pollina announced his intention not to file a nominating petition for the primary election and to contest the gubernatorial election as an independent, he was a primary candidate eligible to receive $1000.00 from an individual

---

[8] One exception to the State's policy is where a candidate contests a primary election and loses or chooses not to run in the general election. In that case, contributions from an individual donor over $1000.00 must be returned to the contributor. *See Campaign Finance Guide* 14. These candidates are easily distinguished from Pollina, since they were candidates in only one election, while Pollina was a candidate in the primary election and is a candidate for the general election.

contributor for the primary election.

Four of the five Contributors donated to Pollina while he was a primary candidate, so the first $1000.00 of their contribution is allocated to the primary election and the second $1000.00 is allocated to the general election. Oxfeld provided $1250.00 between December 3, 2007 and June 25, 2008; Lloyd provided $2000.00 on February 1, 2008; Jerry Greenfield provided $2000.00 on June 30, 2008; and Elizabeth Greenfield provided $1000.00 on July 3, 2008. All of these contributions are lawful. Furthermore, since Elizabeth Greenfield's first $1000.00 contribution was donated while Pollina was a primary candidate, her second $1000.00 contribution made on August 11, 2008, is lawful because it is for the general election. Similarly, Oxfeld may contribute up to an additional $750.00 because her initial contributions were provided while Pollina was a primary candidate, but Oxfeld may also contribute for the general election.

The fifth Contributor is Abbott, who donated $2000.00 on July 27, 2008. Based on the State's practice of not distinguishing between contributions for the primary and general elections and allowing a candidate to receive up to $2000.00 from an individual contributor at any time, Abbot's entire contribution is lawful. According to the State's reasoning, Abbott's contribution may be allocated between expenses Pollina

19

incurred during the time that he was a candidate for the primary election and expenses related to the general election.

Given this resolution of the case, the Court need not address the constitutional issues raised by the parties.

**ORDER**

Wherefore, the Court **grants** Contributors a permanent injunction prohibiting the State from commencing enforcement proceedings against the Pollina campaign which would require it to return Contributors' donations in excess of $1000.00.

Dated at Burlington, Vermont this 15th day of October, 2008.

/s/ William K. Sessions III  
William K. Sessions III  
Chief Judge
